UNITED STATES v. ATLANTIC COAST LINE R. CO. ·

(Circuit Court of Appeals, Fourth Circuit. July 14, 1909.)

No. 893.

1. ACTION (§ 18*)—CIVIL OR CRIMINAL—INTERSTATE CARRIERS OF LIVE STOCK— TWENTY-EIGHT HOUR LAW.

An action by the United States against a railroad company to recover the penalty imposed for violation of Act June 29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1907, p. 918), relating to the carriage of live stock and known as the "Twenty-Eight Hour Law," is a civil suit, with all the incidents of such a suit.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 95–104; Dec. Dig. § 18.*]

2. CARRIERS (§ 37*) — INTERSTATE CARRIERS -OF LIVE STOCK — TWENTY-EIGHT HOUR LAW.

It is no defense to such an action for "knowingly and willfully" violating the statute that the defendant made rules requiring its employés to comply with the same, and that its failure to do so was through the negligence of an employé and in violation of its rules.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk.

Action by the United States against the Atlantic Coast Line Railroad Company to recover the penalty for violation of the twenty-eight hour law. Judgment for defendant, and plaintiff brings error. Reversed.

This is a writ of error to a judgment of the District Court for the Eastern District of Virginia, rendered in an action of debt wherein the United States was plaintiff, and the Atlantic Coast Line Railroad Company, a corporation engaged in interstate commerce, was defendant. This action was brought to recover a penalty of five hundred dollars for a violation of Act June 29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1907, p. 918), known as the "Twenty-Eight Hour Law." The first section of the act reads as follows: " * * * No railroad, express company, car company, common carrier other than by water, or the receiver, trustee or lessee of any of them whose road forms any part of a line of road over which cattle, sheep, swine, or other animals shall be conveyed from one state or territory or the District of Columbia into or through another state or territory or the District of Columbia, or the owners or masters of steam, sailing, or other vessels carrying or transporting cattle, sheep, swine, or other animals from one state or territory or the District of Columbia into or through another state or territory or the District of Columbia, shall confine the same in cars, boats, or vessels of any description for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours, unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight: Provided, that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours. In estimating such confinement, the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without such rest or food or water on connecting roads shall be included, it being the intent of this act to prohibit their continuous confinement beyond the period of twenty-eight hours, except upon the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

contingencies hereinbefore stated: Provided, that it shall not be required that sheep be unloaded in the nighttime, but where the time expires in the nighttime in case of sheep the same may continue in transit, to a suitable place for unloading, subject to the aforesaid limitation of thirty-six hours."

The declaration states that on the 15th day of April, 1907, the defendant company was, and has ever since been, a common carrier and railroad corporation, operating a road over which cattle, sheep, swine, and other animals are conveyed from the state of North Carolina into the state of Virginia, and that on the said 15th day of April it undertook and promised to convey from Aulander, in North Carolina, to Norfolk, in Virginia, certain cattle, namely, three calves, for which a bill of lading in due form was made out and delivered by the defendant to the consignor; that on the same day the calves were loaded by the defendant in one of its freight cars at Aulander for transportation to Norfolk, which car was not supplied with food and water; and that in conveying the said calves between the points above mentioned the defendant knowingly and willfully kept the same continuously confined in said car for a period longer than 28 consecutive hours, to wit, for 50 consecutive hours, without unloading them in a humane manner into properly equipped pens for rest, water, and feeding. The defendant pleaded nil debet, upon which plea issue was joined, and thereupon the parties filed a written stipulation, waiving a jury, and submitting the whole matter of law and fact to the court.

The following is the agreed statement of facts upon which this case was determined by the lower court:

"On April 15, 1907, Conductor E. L. Hollingsworth, on north-bound local freight train, carrying cars known as 'pedlers,' used for picking up freight at various stations en route, at Aulander, N. C., loaded on one of these pedlers cars three calves, crated, consigned to Mr. C. R. Robinson, Norfolk, which were duly entered on waybill, copy of which is hereto attached, and at the same time he received from the agent at Aulander a conductor's live stock report, form 265, copy of which, with blanks unfilled, is hereto attached for illustration, upon which were entered the notations as indicated on the waybill. This train had a small engine and was overloaded with cars, and the conductor was directed to leave five or six of the cars at Ahoskie, with the waybill for the same, to be picked up by a following through freight train. The conductor did not examine the bill upon which the calves were noted, and when he left the car containing the same at Ahoskie, to be picked up by a later through freight train, he failed to call the agent's attention to the fact that it contained these calves. For this reason the car was not forwarded promptly, and arrived at Pinners Point on the night of April 16th, and, there being no facilities for the delivery of live stock at night to the Union Stockyards in Berkeley, the parties to whom delivery was to be made, they were delivered to the consignee on the 17th inst. The company has rules which are delivered to train masters, yard masters, station agents, conductors, and others concerned in the transportation of live stock, and posted in the bulletin books at designated points, which conductors are required to read and sign, the latter to inform the train master that they had read the circular, which prohibits the carrying of live stock for more than 28 consecutive hours without being within that period fed and watered, copy of circular hereto attached. In addition to this circular, the company has a rule, which station agents and conductors are required to obey, that upon the shipment of live stock telegraphic notice is sent to the superintendent of the district over which the shipment moves, who in turn is required to notify the station of destination. These rules are rigidly enforced, and a violation of them, when brought to the attention of the proper official, is followed by suspension or dismissal as the gravity of the case may require. In this particular case, the offending conductor, Hollingsworth, made a statement, copy of which is hereto attached, admitting his fault in not obeying the rules of the company, and he was promptly discharged from the service of the company for this and other violations of the rules, before the institution of this suit. The calves were not unloaded for rest, water, and feeding between the time they were loaded at Aulander, on the 15th of April, 1907, at 10:30 o'clock a. m., and their arrival at Pinners Point, and were not unloaded until the 17th of April; they having been kept continuously confined in the car and in the crate in which they were shipped during the time just stated."

L. L. Lewis, U. S. Atty., for plaintiff in error.

Wm. B. McIlwaine and D. Tucker Brooke, for defendant in error.

Before PRITCHARD, Circuit Judge, and KELLER and McDOW-ELL, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). The statute under which this action was instituted is entitled:

"An act to prevent cruelty to animals while in transit by railroad or other means of transportation from one state or territory or the District of Columbia into or through another state or territory or the District of Columbia," etc.

Thus it will be seen that the purpose of the statute is to prevent any common carrier engaged in transporting interstate commerce from confining cattle, sheep, swine, or other animals in cars, boats, or vessels, for a longer period than 28 consecutive hours without unloading the same in a humane manner into properly equipped pens for rest, water, and feeding, for a period of at least 5 consecutive hours—

"unless prevented by storm or other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight."

The enactment of this law does great credit to our lawmakers, and it should be construed in the spirit in which it is written. Humane instinct forbids that we should cruelly treat or otherwise abuse dumb animals. It is true that, by virtue of Divine authority, they are under the dominion and control of man; yet we are taught from the same source that we should use all means in our power to prevent them from being subjected to unusual or cruel treatment. It was undoubtedly the purpose of Congress in the enactment of this law to make ample provisions for the protection of animals while being transported by interstate carriers.

According to the greater weight of authority, a suit of this character is treated as being a civil proceeding. In the case of Atcheson v. Evart, 1 Cow. 389, 391, which was an action to recover statutory penalty, Lord Mansfield said that:

"Penal action is as much a civil action as an action for money had and received."

Also in the case of Jacob v. United States, 1 Brock, 520, 525, Fed. Cas. No. 7,157, Chief Justice Marshall, in discussing this phase of the question, said that:

"Such an action is a 'civil cause' under the ninth section of the judiciary act of 1789 (Act Sept. 24, 1789, c. 19, 1 Stat. 76), defining the jurisdiction of the District Courts."

The principal question to be determined is as to whether the defendant company "knowingly" and "willfully," within the meaning of the statute, kept the calves in question continuously confined in the car in which they were loaded, as stated in the declaration, for a period longer than 28 consecutive hours, without unloading them for rest, water, and feeding. The duty enjoined upon the company by the statute is plain and explicit, and as to its true meaning there can be no

doubt. The only instance wherein the company is released from performing this duty is—

"when prevented by storm or other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight."

The proper construction of the foregoing provision must necessarily determine the question involved in this controversy. It is insisted by counsel for plaintiff in error that this is a penal statute, and that it was passed in the interest of the public, imposing upon the company a penalty as a punishment for doing a prohibited act, and that the words "knowingly" and "willfully" import an evil intent, and, therefore, in order to sustain a verdict in favor of the plaintiff, it must appear that the act complained of was knowingly and willfully committed in the sense in which these words are used where one is charged with a criminal offense. It has been decided a number of times that the statute in question is not a criminal one, and that it should not be construed according to the strict rules by which courts are governed in criminal cases.

In the case of Armour Packing Co. v. U. S., 153 Fed. 1, 82 C. C. A. 135, 14 L. R. A. (N. S.) 400, it was held:

"But no evil intent is essential to an offense which is merely malum prohibitum. The simple purpose to which the act forbidden, in violation of the statute, is the only criminal intent requisite to the conviction of a statutory offense which is not malum in se. Bishop on Statutory Crimes, § 596b; 1 Bishop's Criminal Law (8th Ed.) pt. 4, §§ 343, 345."

This case was finally carried to the Supreme Court of the United States. That court, in passing upon this point, said (209 U. S. 85, 28 Sup. Ct. 437, 52 L. Ed. 681):

"While intent is in a certain sense essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in order to make out a crime, there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, and that the act does not involve moral turpitude or moral wrong."

In the case of N. Y. Cent. & H. R. R. Co. v. U. S., 165 Fed. 833, 91 C. C. A. 519, the Circuit Court of Appeals for the First Circuit, in passing upon this question, said:

"The word 'willfully' is sometimes used in statutes and indictments, and sometimes omitted from them, for very different reasons. In order that there shall be a punishable evil intent, the criminal law ordinarily requires that there shall be a knowledge of facts, and when with a knowledge of the facts is combined an injurious result which the actor foresaw, or might reasonably have foreseen, all the law ordinarily implies by the word 'willfully' is accomplished."

In the case of United States of America v. Union Pacific Railroad Company (decided January 15, 1909) 169 Fed. 65, the Circuit Court of Appeals for the Eighth Circuit, in referring to a suit of this character, said:

"The defendant denies that its failure to unload the said live stock in accordance with the law was in any way willful or from unavoidable cause which could have been anticipated by the exercise of due diligence and foresight, but, on the contrary, avers that the said failure was wholly caused by

the great and unusual press of business, both on the tracks of the defendant and its stockyards, causing delays at the meeting points of its trains, and failures of its engines, both those carrying the cars aforesaid and those drawing other trains, which affected and delayed the train carrying the said live stock, and alone caused the said live stock to be confined beyond the time limited by law. Counsel for defendant contend that the word 'willfully,' as employed in the statute, necessarily implies an evil purpose or bad motive, and have in their brief collected and reviewed many cases dealing with this word. We find no occasion, however, to follow them through this maze of authority. The word is here employed in connection, not with a crime, or offense malum in se, but with an offense purely statutory subjecting the offender to a civil action only. In view of our former rulings on this question, we are of opinion, and so hold, that as here employed the word means only the intentional doing of an act forbidden by the statute. * * * To hold that some evil purpose or bad motive must be shown in order to constitute a cause of action under section 3 of the act of June 29, 1906, would, in our opinion, thwart the obvious purpose of the legislation. It can hardly be conceived that any reputable carrier would deliberately and designedly, because of ill will or other malevolent feelings towards the dumb animals or their owners, fail to conform to the reasonable and humane requirements of the law. If the law is operative only to restrain the possible exercise of such evil and perverse disposition, it would have little, if any, scope of operation."

As appears from the agreed statement of facts, Conductor Hollingsworth, on a freight train carrying cars known as "pedlers," used in picking up freight at various stations en route, at Aulander, N. C., loaded on one of these cars three calves, crated, consigned to Mr. C. R. Robinson, at Norfolk. It also appears that the shipment was duly noted on the waybill, and that the conductor received from the agent at Aulander a conductor's live stock report, form 265, upon which was entered the notations as indicated on the waybill. It appears from the testimony of the conductor that the train had a small engine, and, being consequently overloaded with cars, he was directed to leave five or six of the cars at Ahoskie, with the waybills for the same. It also appears that the conductor did not examine the waybill upon which the calves were noted, and, when he left the car at Ahoskie, he failed to call the attention of the defendant's agent at that place to the fact that it contained the calves in question; that, owing to his failure to do so, the car was not promptly forwarded and delivered, and that the car containing the calves did not reach Pinners Point until the 17th day of April, two days after their shipment; and were kept confined continuously during that time in the car in which they had been loaded at Aulander until the day on which they were delivered at Pinners Point. It also appears that the calves were not unloaded for rest, water, and feeding between the time they were loaded at Aulander and the time they were unloaded at Pinners Point.

It is true that the defendant company, by its rules, which are delivered to train masters, yard masters, station agents, conductors, and others employed in the transportation of live stock (and which conductors are required to read, sign, and to inform the trainmaster that they have read the circular), prohibits the carrying of live stock for more than 28 hours without being, within that period, properly fed and watered. It also appears from the statement of facts that the company has a rule to the effect that upon the shipment of live stock telegraphic notice is sent to the superintendent of the district over which the ship-

ment moves, and who, in turn, is required to notify the station of destination; that these rules are rigidly enforced, and, in case there is a violation of them, the party thus offending is suspended or dismissed, as the gravity of the case may require. Conductors and station agents are required to obey this rule. It also appears that the conductor in this instance admitted that he did not obey the rules of the company, and it further appears that he was discharged from the service of the company for this and other violations of the rules before the institution of this suit.

That the failure of the conductor to examine the waybill upon which the calves were noted, and his failure to call the attention of the defendant's agent at Ahoskie to the fact that it contained these calves, was inexcusable negligence on his part, cannot be denied. But it is insisted by defendant below that, inasmuch as the company took the precautions hereinbefore mentioned to insure a strict compliance with the law on the part of its conductors, agents, and other persons, such action on its part is sufficient to relieve the company from liability, notwithstanding its agent, the conductor, wholly neglected to perform the duties enjoined upon the company by the statute. And the question naturally arises as to whether this is a valid defense under the statute. It is well settled that a corporation can only act through its agents, and, such being the case, it necessarily follows that a lack of foresight and due diligence on the part of those acting as agents in complying with the statute is negligence. Therefore, in this instance, we think the corporation has, within the meaning of the statute, "knowingly" and "willfully" failed to comply with the law, notwithstanding the fact that there may have been no evil motive or intent in the transaction. In other words, we think a negligent failure to comply with the law, with a knowledge of facts as shown in this instance, is willful failure.

The case of Montana Central Railway v. U. S., 164 Fed. 400, 90 C. C. A. 388, involved a shipment of horses, and the answer filed therein averred, among other things, that long prior to the time the shipment in question was made the defendant company, by printed circulars and otherwise, addressed to its agents, notified them of the conditions and requirements of the act, and also stated to them that they were required to conform strictly with the requirements of the same, and that afterward a circular was issued, addressed to all agents, yard masters, and others in the employ of the company, again requiring of them strict compliance with the law, and that both of these circulars were duly posted. It was further averred that the failure to unload the horses for rest, water, feeding, etc., was due to the forgetfulness and unintentional neglect of its train dispatchers at Great Falls, etc. This case was heard by the Circuit Court of Appeals for the Ninth Circuit, and, in disposing of the contention of the defendant to the effect that, inasmuch as it had taken the pains to advise its agents and other employés as to the provisions of the statute, and had also compelled all such persons to conform strictly to the instructions contained in the circulars for the observance of the act, Judge Ross said:

"The sole defense is that the statute imposes the penalty only on the carrier who 'knowingly' and 'willfully' fails to comply with its provisions; and it

173 F.—49

is earnestly contended for the plaintiff in error that the company here did not 'knowingly' and 'willfully' confine the horses for the time and under the circumstances stated. Its counsel insists that the case, if not a criminal one, is at least of a criminal nature, and that to it should be applied the same strict rules of construction and of evidence which are applied in criminal prosecutions. In that contention he is supported by the cases of United States v. Louisville & N. R. R. Co. (D. C.) 157 Fed. 979, and United States v. Illinois Central Railroad Company (D. C.) 156 Fed. 182. But we are unable to take that view of the matter. We do not understand the statute to make a violation of its provisions a crime. It is true that a penalty is imposed for its violation; but the penalty is a pecuniary one only, which Congress expressly provided shall be recovered by civil action in the name of the United States, having, as we think, the ordinary incidents of a civil action. This view is in accord with that taken of the same and of a similar statute in the case of United States v. Southern Pacific Railroad Company (D. C.) 157 Fed. 459, United States v. Central of Georgia Railway Company (D. C.) 157 Fed. 895, United States v. Philadelphia & Reading Railway Company (D. C.) 160 Fed. 696, and United States v. Baltimore & Ohio S. W. R. R. Co. (C. C. A.) 159 Fed. 33, 86 C. C. A. 223. The company, being a corporation, could, of course, only act through agents, and its answer expressly alleges that the horses in question were confined on its cars in violation of its statutes by reason of the oversight, forgetfulness, and unintentional neglect of its train dispatchers. As was held by the court below, we think the facts as expressly alleged in the answer negative the claim that the failure to rest, feed, and water the horses was not the result of knowledge and willfulness on the part of the company. It knew through its agents, and through them only could know, that the horses were loaded on its cars, when their transportation commenced, where it should rest, water, and feed them as required by the statute, instead of doing which, through its agents, it continued to carry them in its cars longer than the statutory period of 28 hours without rest, feed, or water. When the company did this, according to its own averments, by and through the only means it transported or could transport them, at all, namely, its agents, we do not think that it can be heard to say that it did not do so 'knowingly and willfully.'"

It cannot be reasonably contended that the failure of the company in this instance to unload the calves "in a humane manner into properly equipped pens for rest, water, and feeding," was due to "storm or other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due care and foresight." It was admitted by the conductor that he neglected to examine the waybill upon which the calves were noted, either before or at the time he left the car containing the same at Ahoskie. This was clearly negligence on his part, and on account of which he was very properly removed by the company. The negligence of the conductor in this respect was the negligence of the company, and clearly renders the corporation liable under this statute.

If the publication of circulars, as well as rules, delivered to train masters, yard masters, station agents, and others concerned in the transportation of live stock, and posted on bulletin boards at designated points, which conductors are required to read and sign (and the latter to inform the train master that they have read the circulars), which prohibits the carrying of live stock for more than 28 hours without being within that period properly fed and watered, is sufficient to relieve the company from liability for the acts of its servants and agents, the corporation would thus be enabled to practically nullify the statute and render its provisions nugatory. The defendant bases its defense upon the ground that a corporation can, in advance, by the pub-

lication of letters, circulars, and otherwise, as to the duties to be performed by its servants, agents, etc., placed itself in a position where, notwithstanding the fact that its agents may violate the law with impunity, the corporation cannot be reached by the statute which was passed for the express purpose of requiring at its hands the performance of a duty which is imperative and cannot be avoided, except as hereinbefore stated. A simple statement of the proposition clearly shows the fallacy of the theory as a defense in this instance relied upon by the defendant.

We have carefully considered the various cases cited by counsel for defendant in support of their contention; but we do not think that we are governed by the rule laid down in these cases in the consideration of this controversy. It follows, from what we have said, that the judgment of the court below must be reversed. Inasmuch as this case was tried wholly upon an agreed statement of facts, we would, if the sum recoverable by the United States were definitely fixed by the statute, direct the entry of a judgment therefor; but, inasmuch as section 3, Act June 29, 1906, prescribes a penalty of not less than $100 nor more than $500 for a violation of its provisions, there is here matter of discretion to be exercised by the trial court, and the course followed in Rathbone v. Board of Com'rs, 83 Fed. 125, 27 C. C. A. 477, by the Circuit Court of Appeals for the Eighth Circuit, is not here applicable.

The judgment of the court below is therefore reversed, and the case will be remanded for further proceedings in accordance with the views herein expressed.

Reversed.