UNITED STATES v. PHILADELPHIA & R. RY. CO. (four cases).

(District Court, E. D. Pennsylvania. December 28, 1916.)

Nos. 4280, 4322, 4328, 4330.

CARRIERS ⊜‒37—TRANSPORTATION OF LIVE STOCK—THIRTY-SIX HOUR LAW—"KNOWINGLY AND WILLFULLY."

Under the law (Act June 29, 1906, c. 3594, 34 Stat. 607 [Comp. St. 1913, §§ 8651–8654]), prohibiting carriers of animals confining them for more than 36 hours without unloading for rest, water, and feeding, unless prevented by storm or other accidental or unavoidable causes which cannot be anticipated or avoided by exercise of due diligence and foresight, and declaring a penalty for a carrier who "knowingly and willfully" fails to comply with such provision, while every confinement for more than such period is prohibited unless it appears with reasonable certainty to come within the exceptions, the penalty is not imposed unless it clearly appears

⊜‒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the carrier acted with knowledge that the thing prohibited was being done, but if it had this knowledge, it was acting willfully.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.

For other definitions, see Words and Phrases, First and Second Series, Knowingly and Willfully.]

Actions by the United States against the Philadelphia & Reading Railway Company, for penalty for confinement of cattle in violation of Thirty-Six Hour Law. Trial by the court. Judgment for plaintiff.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa.

Wm. Clarke Mason, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. There were in all six actions of the same general nature against the same defendant growing out of, in results, similar transactions. As bearing upon the liability of the defendant the circumstances differ. The cases were, however, all tried together, and can be disposed of in one opinion indicating the conclusions reached in each case. This will save reiteration of views and repetition of statements of what are in legal effect the same things. Trial by jury was by agreement dispensed with, and the cases tried by the court without the intervention of a jury under the provisions of the statutes. Two of the cases have been dropped, leaving four to be now decided.

A general view from the standpoint of the evil, the scope and purpose of the remedy proposed, and the specific remedy provided will be of possible assistance in construing the acts of Congress under consideration. The evil was the economic and ethical ill flowing as a consequence from food cattle being confined an undue length of time without food or water. What was proposed was to prevent the economic loss and cruelty to dumb animals involved in such practices. Aside from all constitutional considerations, these laws are police regulations. The general aim of the remedy was to divert the influence of the selfish, commercial interests of those concerned with cattle shipments from operating toward bringing about these evil consequences and turn them so as to operate toward preventing the evils. The primary duty of feeding and watering the cattle was that of the owner. More than that the shipper named the place of destination, and knew, or could learn, the length of time required to reach it. He could not, however, control the shipment after it had been delivered to the carrier, who alone could provide a place for unloading, feeding, and watering if and when required. This fact made the carrier a possible necessary actor. It was, in consequence, necessary to reach both carrier and shipper, and this was proposed to be accomplished by reaching the carrier directly and the shipper indirectly through the carrier. If not a necessary, this was, at least, a convenient, way of reaching both. This brought into the act the provision that the carrier was made responsible for the performance of the duty, with the right of recouping the expense from the shipper. The remedy ap-

plied presents these essential features: A definition of what was required and what forbidden; a recognition of exceptions to the general rule and an enumeration of them; and the imposition of a penalty upon all violators of the law, and a description of those who were to be deemed violators.

The first definition lends itself to easy and accurate statement. The thought of what was within the second, and who within the third, is not easily expressed so as to be always satisfactorily definite. This is because the character of the act and the culpability of the actor varied with the circumstances, and, in consequence, could only be defined in terms more or less general. We get, however, these three thoughts: Confinement, etc., for more than 36 hours is absolutely forbidden. Such confinements, when due to storms or accidents, which could not reasonably be expected to be anticipated, are excepted. The carrier is not to be visited with the penalty unless it "knowingly and willfully" violated the statute. Certain other thoughts follow these. What may be termed the "corpus delicti" appears with the fact of confinement for the prohibited time, unless it also appears, or is shown by way of defense, that it was the result of storm or the kind of accident defined. The guilt of the defendant is not shown by the mere fact that the forbidden thing has been done by it, but by the character of its participation in the thing done. The things which take away criminality from the act done and bring it within the exceptions and the things which relieve the actor from guilty participation in the act done may sometimes blend into each other, but are, if the expression is allowable, distinct as long as they can be distinguished. In each of these cases the cattle had been kept confined. In some instances this can be and is found from the evidence to have been due to storms, and in other instances to wrecks and other casualties, which carry with them the idea of what is practically (although not always in strictness) vis major; in other words, that part of the thought of accident which distinguishes between what happens and what is intentionally or even voluntarily done, but not that part which excludes the idea of fault. In other instances the confinement resulted, not from storms or accidents of the kind attempted to be defined, but from delays which were unanticipated and unavoidable only in the sense that they were caused by conditions of congestion of traffic or otherwise which practically prevented the cattle trains from sooner reaching their destination or the cattle being unloaded.

The defense set up has been presented in a spirit of absolute candor and frankness, and with every effort to get the exact fact situation before the court. It, therefore, merits and should receive as frank a consideration. The thought of it is (as we grasp it) that, excusing conditions of the kind mentioned, whether they bring the thing done within the exceptions or not, do bring into the case such exculpating facts as that the actor cannot be found to have acted "knowingly and willfully." There is this further basis for the distinction made. The definition of the prohibited thing has two purposes. One is to found a duty upon the carrier to unload, feed, and water, and to confer a right to charge the expense to the shipper. The other

is to found the imposition of a penalty upon the carrier. Mere lapse of time gives the right. All delays not within the exceptions create the duty. The penalty, however, is only imposed when the delay is so inexcusable as to justify a finding that it was willful.

The contrast of the view of counsel for the United States with this view of the defendant presents the point in controversy. Justice cannot be done to either view by thus compressing the argument into a sentence, but it will serve the purpose of presenting the contrasting views. Against the view thus expressed is this other. Congress had in mind to define the corpus delicti. This is any confinement not due to storms or accidents, etc. Congress further had in mind to impose a penalty upon the carrier whenever the forbidden thing was done, if the carrier had knowledge it was being done, and that this knowledge carries with it the idea of willfulness. The same thought may be presented in another way. Any defense to an action of this kind must rest upon one of two grounds. One is the absence of a corpus delicti. In this enters the fact of storms or accidents. If such fact is present, the defendant is not liable because no offense has been established. The other is that the offense, although made out to exist and to have been committed by the defendant, was committed unwittingly. If the defendant did not have knowledge, it is not to be penalized, even though its ignorance was due to its own carelessness, and it was misled by the negligence of its own agents or servants.

To resummarize these defenses, they must rest upon the absence of the offense or the want of knowledge on the part of the defendant. The courts, in order to advance the remedy, will give the offense feature of the act a liberal construction, and while in construing the penal clause they will construe it strictly, they will not confuse the one with the other. The ab inconvenienti argument is vigorously pressed by each side, and the discussion pro and con need not be further followed.

Our conclusion is that the proper construction of the act must be found in a search for the will of Congress, and this is best disclosed by the policy which Congress meant to be followed, and that this policy is to place every confinement among those prohibited, unless it appears, with reasonable clearness, to come within the exceptions, and to refuse to impose the penalty unless it clearly appears the defendant acted with knowledge that the prohibited thing was being done, but if it had this knowledge, it was acting willfully within the meaning of the act of Congress. This we think to be the sense in which Congress employed the word, independently of whether "willful" is etymologically a compound of full and wile or full and will. This, we think, would be the conclusion reached if we were construing it without the aid of the adjudged cases. It is reached, however, because we think this meaning to be the one already found for us in United States v. Union Pacific, 169 Fed. 65, 94 C. C. A. 433, and United States v. Lehigh Valley, 204 Fed. 705, 123 C. C. A. 9. In construing this statute we have found the latter case to be most helpful.

Following the distinction attempted to be made, the cases in which the delay was due to storms, wrecks, or other accidents have been

withdrawn, and in the other cases where accident is not set up as a defense, we find the offense to have been committed knowingly and willfully by the defendant, and enter judgment in each case against the defendant, with costs, etc. The parties have leave to prepare and submit findings in accordance herewith in each case, together with such requests for findings as either may wish to submit, and exceptions are allowed to each as indicated.

---

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.